IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


| | | |
|---|---|---|
| ANIL VAZIRANI and<br>SECURED FINANCIAL SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | **CIVIL ACTION** |
| | ) | |
| v. | ) | |
| | ) | No.  09-1311-MLB |
| | ) | |
| MARK V. HEITZ and<br>JORDAN CANFIELD, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| VAZIRANI & ASSOCIATES<br>FINANCIAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION** |
| | ) | |
| v. | ) | |
| | ) | No.  11-1032-MLB |
| | ) | |
| MARK V. HEITZ and<br>JORDAN CANFIELD, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


<u>**MEMORANDUM AND ORDER**</u>

Before the court are the following:

1.   Defendants' motion for summary judgment (Doc. 121);

2.   Plaintiffs' response (Doc. 132); and

3.   Defendant's reply (Doc. 137).

<u>Undisputed Facts</u>

The following undisputed facts were in existence during the relevant time period:

<u>Individuals</u>

Anil Vazirani was an insurance agent.  Vazirani contracted as an independent agent, also known as a producer, with life insurers to

sell life insurance and annuity products of such insurers.

Mark Heitz served as President of Aviva Sales and Distribution.

Jordan Canfield served in various executive positions for sales and distribution at Aviva, including Executive Vice-President of Sales and Distribution. Canfield had direct responsibility for the management of Aviva's independent distribution and sales relationships. Canfield left Aviva in August 2009 to become CEO of Innovation Design.

Heitz and Canfield each had the authority to terminate Aviva's producer contracts, including its contracts with Vazirani and his downline agents.

Justin Jacquinot was an Aviva regional vice president of sales and marketing who reported to Canfield. One of Jacquinot's responsibilities was "interfacing" with Vazirani.

Ron Shurts was a principal of Annexus Distributions.

<u>Business Entities</u>

Secured Financial Solutions, LLC ("SFS") and Vazirani & Associates Financial, LLC ("Vazirani & Associates") were owned and operated solely by Vazirani. SFS was a marketing name only. It did not sell insurance products and had no downline producers or agents. SFS had no contractual relationship with Aviva.

Vazirani & Associates was an independent marketing organization, also known as an IMO, that worked with multiple insurance companies to perform distribution and marketing functions for one or more of such insurers' products or product lines.

Aviva Life and Annuity Company (Aviva) provided life insurance, annuity products and other services to individuals, families and

-2-

businesses. Aviva used many marketing organizations to recruit agents to sell its products and to provide marketing and sales support. Aviva considers some of those organizations its "key distribution partners," but Vazirani's organization was not one of them.

Advisors Excel, LLC ("Advisors Excel") was an IMO located in Topeka, Kansas. Advisors Excel competed with other marketing organizations, including Vazirani & Associates, for downline agents. Advisors Excel was one of Aviva's key distribution partners since at least 2007.

Annexus Distributors AZ, LLC, formerly known as Shurwest Product Connection, LLC, developed with Aviva a line of annuity products ("Aviva's Annexus products") that were issued by Aviva under one of Aviva's three distribution channels. Aviva's Annexus products were marketed and distributed differently than the annuities offered under Aviva's other two distribution channels. Aviva granted Annexus Distributors the exclusive rights to market and sell Aviva's Annexus products. Annexus Distributors had the right to determine (i) what marketing organizations could market Aviva's Annexus annuities to agents and (ii) which Aviva agents could sell such annuities to consumers. The only IMOs that were authorized to market Aviva's Annexus products to agents were a small group of IMOs which had been hand-picked by Annexus Distributors. Annexus Distributors were granted this exclusive marketing and distribution authority by contracting directly with those IMOs.

Financial Independence Group ("FIG") was one of Aviva's "key core marketing groups" since approximately 2008. FIG and Advisors Excel were two of the select group of approximately 12 IMOs that were

-3-

authorized by contract with Annexus Distributors in 2008 to: (i) market Aviva's Annexus line of products to other agents, and (ii) recruit agents to such IMO's downline to sell Aviva's Annexus products.   Neither Vazirani, Vazirani & Associates nor SFS were members of the select group of IMOs contracted with Annexus Distributors.

Creative Marketing International Corporation (CMIC) was a marketing organization that performed marketing and distribution functions for several different life insurers.   CMIC was a wholly-owned subsidiary of Aviva which competed with Vazirani for downline agents.

Innovation Design was a product development company that developed annuity and life insurance products.   Innovation Design was not (and never has been) a marketing organization, did not have (and has never had) a downline of insurance agents, and did not sell (and never has sold) insurance products.

<u>Aviva's Business Practices Regarding IMOs</u>

Aviva had in place certain rules that govern the conduct and practices of IMOs concerning the recruiting of agents to such organizations' downlines to sell Aviva products.

One of Aviva's rules governing the conduct of IMOs in recruiting agents prohibited an IMO such as Vazirani & Associates from recruiting a producer away from another IMO to sell the same Aviva distribution-channel products by offering such producer a higher commission level within the first six months of transfer.

Aviva never had a policy placing any restrictions on an IMO's ability to bind downline agents to non-compete covenants.

-4-

## Vazirani's Pre-termination Dealings with Aviva

Aviva's contract with Vazirani authorized him, subject to certain terms and conditions, to sell Aviva life insurance and annuity products as an independent producer, and to recommend that Aviva contract with additional agents to sell certain Aviva products as part of the Vazirani downline.

From approximately 2005 until April 1, 2009, Vazirani contracted with Aviva and/or its predecessor entities, American Investors and AmerUs, as an independent agent to sell Aviva life insurance and annuity products. Vazirani's producer contract with Aviva did authorize him to sell Aviva's Annexus products to consumers.

Vazirani and/or Vazirani & Associates received compensation from Aviva in the form of (i) commissions for his personal sales production and (ii) override commissions for the sales production of agents who were contracted with Aviva as part of the Vazirani downline.

By the close of 2008, approximately one hundred (100) of Vazirani's downline producers were contracted with Aviva USA and approximately forty percent (40%) of his commission income was generated from the sale of Aviva annuities.

Aviva's contract with Vazirani provided that it could be terminated with or without cause by either party immediately upon written notice to the last known address of the other party. Similarly, Aviva's contracts with Vazirani downline agents provided that such contracts could be terminated with or without cause by either party immediately upon written notice to the last known address of the other party.

## Vazirani Was a Top Producer for Aviva

From 2005 through 2008, Vazirani personally produced almost $10 million in annuity premiums for Aviva. In addition, his team at SFS produced almost $100 million in annuity premiums for Aviva. In 2008, Vazirani began to significantly "ramp up" the business he and his team were writing with Aviva. During the time Vazirani was contracted with Aviva, he wrote profitable business and made contributions to Aviva's corporate sales goals.

Vazirani's efforts on the behalf of Aviva did not generate a single consumer complaint. Jacquinot had no issues with Vazirani's performance in 2007 and observed no "red flags" regarding Vazirani's conduct that year. Jacquinot's observation changed based on incidents involving Vazirani in 2008.

<u>Vazirani's Side-Deals With Rettick/CRP</u>

Aviva prohibited its marketing organizations and agents from making private arrangements or side-deals for payments on Aviva production to marketing organizations or agents not contracted with Aviva.

In the summer of 2008, Aviva terminated its contract with a marketing organization because that organization appeared to have a prohibited arrangement with Covenant Reliance Producers ("CRP"), a separate marketing organization that did not have an Aviva contract, and its principal, Matt Rettick.

Canfield and Jacquinot had concerns that Vazirani also might have a prohibited side deal with Rettick/CRP.

Vazirani knew in 2008 that Aviva did not want to do business with Rettick and that Rettick/CRP did not have an Aviva contract.

Jacquinot questioned Vazirani about his relationship with

-6-

Rettick/CRP. In response, Vazirani emailed Jacquinot on September 6, 2008, saying: "I do not and will not cut any commission deals with Matt Rettick."   In fact, however, Vazirani had agreed to pay Rettick/CRP 50 basis points (one-half of one percent) on all Aviva premium produced under Vazirani. Vazirani estimates that he paid Rettick/CRP approximately $240,000 on Aviva production in 2008 pursuant to this agreement.  Vazirani's associate, James Regan, also understood that CRP was not to be paid on Aviva business; to his knowledge, Vazirani also understood this.  Nevertheless, on or about September 6, 2008, Regan sent an email to Rettick, certain others at CRP, and Vazirani, saying: "There cannot be a paper trail at all that leads to CRP with regard to the Aviva contract."   In addition, Vazirani emailed a CRP executive regarding "American Investors Aviva – Amerus," saying "I spoke to Matt [Rettick]; nobody needs to know about any compensation agreement."

<u>The Blast Email</u>

On August 19, 2008, Regan sent out a blast email on behalf of Vazirani/SFS marketing Aviva's Annexus products to other agents.  The email stated in part: "Hello all, this is Phil Graham from FIG Marketing writing to you on behalf of VAZIRANI/SFS."

Graham did not send the blast email marketing Aviva's Annexus product on behalf of Vazirani/SFS; nor did he authorize Vazirani or anyone else at SFS to send the blast email that purported to be from "Phil Graham of FIG Marketing" "on behalf of VAZIRANI/SFS." Instead, Graham directed Vazirani not to send out the email.  Vazirani testified that he could not think of a legitimate reason why he (Vazirani) would have written the email himself to make it appear that

-7-

the email was from Graham. Vazirani wrote the email to make it appear that it was from Graham.

Graham and Canfield were concerned that the email might result in the termination of FIG's authorization to market Aviva's Annexus products.

Advisors Excel, which was one of the IMOs authorized to market Aviva's Annexus products to other agents, reported this incident to Aviva and Annexus Distributors.

Ron Shurts, who was a principal of Annexus Distributors, was very upset when he learned of the blast email sent "on behalf of VAZIRANI/SFS" marketing Aviva's Annexus products to other agents. Shurts urged Canfield to terminate Vazirani because of the blast email and, using profanity and an uncomplimentary (but ethnically inaccurate) reference to Vazirani, assured Graham that Canfield intended to terminate Vazirani.

<u>Aviva Terminates Vazirani</u>

In early 2008, Vazirani offered Lee Hyder, an agent whose Aviva contract was in the Advisors Excel downline, a higher commission level if he would join the Vazirani downline. Advisors Excel learned of this offer and provided a copy of it to Jacquinot, whose responsibilities included interfacing with certain marketing organizations, including both Advisors Excel and Vazirani. Jacquinot reported the matter to Canfield. Both Canfield and Jacquinot viewed Vazirani's offer as a serious rule violation. Canfield considered terminating Vazirani's contract then but decided to discipline him instead.

In early November 2008, Canfield concluded that Aviva's contract

with Vazirani should be terminated.  Canfield reached this conclusion, in part, due to the series of Vazirani problems that he had had to deal with and increasing concerns he had with Vazirani's business practices and relationship with Rettick/CRP.  Some of the issues had been the subject of complaints by (i) one of Aviva's key distribution partners, Advisors Excel, and (ii) Annexus Distributors (including its principal, Ron Shurts), who had the exclusive rights to market and sell all annuities issued by Aviva.

Aviva's standard practice was that if it terminated its contract with a marketing group or agent, it would also terminate all agent contracts in that agent's downline.

On or about November 6, 2008, Canfield called Vazirani and told him that Aviva had decided to terminate its contract with Vazirani as well as the Aviva-agent contracts that were in his downline.

On December 12, 2008, Aviva's lawyer, John Clendenin, sent Vazirani's attorney a letter stating that "Aviva intends to terminate the Contract without cause effective December 19, 2008."  However, the December 19, 2008 termination date was inconsistent with a January 30, 2009 termination date that Canfield had referenced in his November 6, 2008 telephone conversation with Vazirani.  Aviva agreed to move back the effective date of termination.  Specifically, on Christmas Day, December 25, 2008, Clendenin sent Vazirani's lawyer an e-mail stating:

> Following up on our Tuesday telephone call, this email will confirm that Aviva will agree to push Anil Vazirani's termination to be effective January 30, 2009.  His independent producer agreement with Aviva will be terminated without cause on that date.  This termination date comports with Mr. Vazirani's allegations concerning Jordan Canfield's November 6, 2008 telephone call.

On or about February 9, 2009, Aviva sent Vazirani formal,

effective written notice required by his Producer Agreement that Aviva was terminating its contract with him effective April 1, 2009. Aviva also sent to the agents in the Vazirani downline formal, effective notice that Aviva was terminating their Aviva agent contracts as well.

By letter dated March 20, 2009, Clendenin gave the following explanation for Aviva's termination of Vazirani's producer contract:

> While Aviva certainly has business reasons for terminating Mr. Vazirani's producer contracts, it was not required to. As spelled out below, Mr. Vazirani's contracts were terminated due to a change in Aviva's distribution strategy and as a result of market forces that have caused Aviva to exert control over exponential growth in annuity sales.
>
> * * *
>
> Aviva decided to terminate Mr. Vazirani and his downlines in the initial stages of the deferred annuity sales bubble. His termination was part of Aviva's attempt to focus on core marketing groups and producers in order to exert control on burgeoning annuity sales. As time has progressed over the last two months, however, Aviva has initiated even more significant measures to deemphasize annuity sales and redirect sales focus to the company's life insurance product lines. Aviva's actions to control the flow of new annuity sales has [sic] nothing to do with Mr. Vazirani or his group. Nor does it have anything to do with alleged communications by CMIC, Annexus Group or others.

### Aviva Decides to Slow Annuity Sales

Beginning in the fourth quarter of 2008 and continuing through the first quarter of 2009, Aviva took steps to slow its annuity sales in order to preserve capital.  The steps included terminating thousands of agent contracts.  All of those contract terminations were effective no later than April 1, 2009.

Some of the terminated groups had had more premium production in 2008 than Vazirani and his downline agents.

Most of the Aviva production generated by Vazirani and his

-10-

downline was for the sale of annuities under Aviva's American Investors distribution channel.

The groups terminated included nearly all of those contractors who, like Vazirani, were at the highest commission level for the sale of annuities within Aviva's American Investors distribution channel.

Some of the terminated groups, in addition to Vazirani, were affiliated with FIG.

Vazirani admits that he can only speculate as to whether his Aviva contract would have remained in effect beyond April 1, 2009, but because none of his other insurance carrier contracts had previously been terminated, he believed his contract with Aviva would continue "indefinitely."

### The Purported Washburn University/Sigma Phi Epsilon, Advisors Excel and Innovation Design Connection

Heitz obtained his undergraduate degree from Washburn University in Topeka, Kansas in 1974 where he was a member of the Sigma Phi Epsilon fraternity.

David Callahan, Cody Foster, and Derek Thompson each graduated from Washburn more than 25 years after Heitz graduated. Callahan and Foster were members of the Sigma Phi Epsilon fraternity while they attended Washburn University. Callahan, Foster and Thompson founded Advisors Excel.

As of November 2008, when Canfield told Vazirani of the decision to terminate Aviva's contract, Canfield had not considered leaving Aviva nor had he had any discussions with anyone about such a possibility.

In April or May 2009 Canfield first considered leaving Aviva.

Canfield talked to various third parties about employment opportunities before he discussed with any of the Advisors Excel founders about possibly leaving Aviva.   Canfield received employment offers from several third parties in the summer of 2009 before he left Aviva.

Canfield left Aviva's employ in or about August 2009 to become the chief executive officer of Innovation Design.   Canfield and the three principals of Advisors Excel (Callahan, Foster and Thompson) each owned a 25% interest.

For the first two years of its existence, Innovation Design's offices were located within Advisors Excel's headquarters in Topeka.

The fact that two of Advisors Excel's principals (Callahan and Foster) were members of the same college fraternity as Heitz had nothing to do with the decision to terminate Vazirani's contract.

<u>Disputes of Fact</u>

The purported factual disputes must be viewed from the perspective of what this case is, and is not, about.   First, the "is not" aspect.   This is not a breach of an employment contact case. Vazirani was an independent contractor of Aviva, not an employee.   SFS had no contract at all with Aviva.   The Vazirani/Aviva independent contractor agreement could be terminated at any time, for any reason, by either Vazirani or Aviva.   Aviva terminated the contract and Aviva is not a defendant.   Neither Vazirani nor SFS had a contractual relationship of any kind with Heitz or Canfield.   So, what <u>is</u> the case about?

Well . . . Vazirani claims that Heitz and Canfield, acting outside the scope of their respective employment with Aviva, conspired

to cause Aviva to terminate Vazirani's contract in order to benefit their own interests and/or those of Advisors Excel, its founders (Callahan, Foster and Thompson), Creative Marketing, Annexus and Shurts. Vazirani attaches great significance to the fact that Heitz, Callahan and Foster attended Washburn University where they were members of the same social fraternity, albeit 25 years apart. Vazirani and SFS's basic theory of recovery is that by conspiring to advance their own interests, and the interests of others, Heitz and Canfield tortiously[1] interfered with Vazirani and SFS's "contracts and business expectancies with Aviva and Vazirani downline agents."

Heitz and Canfield aver that they considered termination of Vazirani's contract to be in Aviva's interest and consistent with its goal of reducing annuity sales. Both men deny that they received any benefit, direct or indirect, from the termination or that they had any personal interest in the matter. Both men also deny ever having any financial interest in Advisors Excel or Annexus.

Vazirani purports to controvert these averments with the following unedited responses:

> On July 30, 2008, Advisors Excel principal David Callanan demanded that defendant Canfield terminate the contract of the independent marketing organization "Metro." Mr. Canfield followed Mr. Callanan's order. In response Mr.

---

[1]In the response to defendants' motion, Vazirani claims that his termination was in retaliation for his "whistleblowing" activities for reporting to Aviva non-compliant advertisements by agents affiliated with CMIC, an Aviva subsidiary. Nevertheless, the pretrial order (Doc. 120) does not mention "retaliation" either in plaintiffs' contentions or theories of recovery or in the factual issues section. Therefore, the court will not entertain any claim by Vazirani that defendants retaliated against him.

Callanan thanked his fraternity brother Canfield[2] for "his support and protection"and Mr. Foster of Advisors Excel commented that "I like the way Jordo rolls."

By letter dated March 20, 2009, Aviva's counsel Mr. Clendenin finally offered this provably false explanation for Aviva's termination of Mr. Vazirani's producer contract:

> While Aviva certainly has business reasons for terminating Mr. Vazirani's producer contracts, it was not required to. As spelled out below, Mr. Vazirani's contracts were terminated due to a change in Aviva's distribution strategy and as a result of market forces that have caused Aviva to exert control over exponential growth in annuity sales.
>
> * * *
>
> Aviva decided to terminate Mr. Vazirani and his downlines in the initial stages of the deferred annuity sales bubble. His termination was part of Aviva's attempt to focus on core marketing groups and producers in order to exert control on burgeoning annuity sales. As time has progressed over the last two months, however, Aviva has initiated even more significant measures to deemphasize annuity sales and redirect sales focus to the company's life insurance product lines. Aviva's actions to control the flow of new annuity sales has [sic] nothing to do with Mr. Vazirani or his group. Nor does it have anything to do with alleged communications by CMIC, Annexus Group or others.

Aviva's stated claims for the grounds for terminating Mr. Vazirani's producer contract as set forth above, are false. In fact, Mr. Vazirani was affiliated with a key core group of Aviva, Financial Independence Group ("FIG").

Mr. Vazirani was never an "A" level producer with Aviva. Rather, he was affiliated (as a "B" level producer) with Aviva's key core group FIG through Aviva's Amerus distribution channel.

Mr. Vazirani was also at the "W" level under FIG (which received a production bonus for Mr. Vazirani's team) for Aviva's American Investors distribution channel.

---

[2]There is nothing in the record to show that Canfield and Callahan were "fraternity brother[s]."

In other words, Mr. Vazirani was, on multiple levels, part of a key core group of Aviva (FIG) that Aviva had made the decision to "focus on." Moreover, Mr. Vazirani has the strong support and backing of FIG's Chief Sales Officer, Phil Graham. As such, his producer contract never should have been terminated pursuant to Aviva's new marketing strategy as outlined in attorney Clendenin's March 20, 2009 letter.

The Aviva point person for Mr. Vazirani, and the individual with the most knowledge regarding issues with Mr. Shurts and Advisors Excel, Aviva Vice President of Sales and Recruiting Justin Jacquinot, did not recommend termination of Mr. Vazirani's producer.[3]

At 4:02 p.m. that same day Defendant Canfield instructed Mr. Vazirani's point person at Aviva, Justin Jaquinot, as follows: "We need to cancel Anil … next week. I told Shurts and Advisors that we would. JC"

Defendant Canfield left Aviva's employ in or about August 2009 to become the Chief Executive Officer of Innovation Design Group.

Canfield and the three principals of Advisors Excel formed Innovation Design in or around August 2009, with each of them owning a 25% interest.

For the first two years of its existence, Innovative [sic] Design Group's offices were located within Advisor Excel's headquarters in Topeka, Kansas.

Vazirani additionally repeats his reliance on the Washburn/Sigma Phi Epsilon "connection."

Vazirani's remaining disputes with defendants' facts, again unedited, are as follows:

**26.    In early 2008, Vazirani offered Lee Hyder, an agent whose Aviva contract was in the Advisors Excel downline, a commission level if he would join the Vazirani downline that was higher than Hyder was at in the Vazirani downline.**

_____

[3]Jacquinot's actual testimony on this point was: "I didn't make a recommendation either way."

Defendants Fact No. 26.  Controverted. Mr. Vazirani told Mr. Hyder that if he met certain sales levels with insurance company approval, he may in the future receive a higher commission level. Mr. Vazirani did not promise a guaranteed higher commission level.  Moreover, the entire Hyder affair was a ruse. Hyder never intended to join Mr. Vazirani's team; rather, he was sent by Advisors Excel to talk with Anil to try to "set him up"for termination.

**35. In fact, Vazirani had agreed to pay Rettick/CRP 50 basis points (one-half of one percent) on all Aviva premium produced under Vazirani.**

Defendants Fact No. 35.  Controverted. Mr. Vazirani was clear in his deposition testimony that he did not split commissions with Mr. Rettick/CRP on Aviva business but rather paid him a marketing reimbursement to help cover their cost of supporting Vazirani's advisors (by providing training, trips, gift programs, and incurring other marketing expenses) on the contracts where CRP was Mr. Vazirani's upline producer.

**102. SFS has never had downline producers or agents.**

**103. SFS has not lost any revenue because of the terminations.**

Defendants Facts Nos. 102 and 103

SFS did have and does have contracts with Plaintiffs' downline agents.  Defendants' contention that, as to SFS, there was no contract or business expectancy with which to interfere is simply not true.

As a result of Aviva's termination of Mr. Vazirani's producer contract, many of his downline agents have elected to end their business relationship with SFS. In addition, the termination has made it more difficult for Mr. Vazirani and for SFS to recruit new downline agents and has damaged the SFS "brand" through which Plaintiffs direct all of their marketing efforts. This has caused both Mr. Vazirani and SFS to suffer substantial damages, including damages to SFS's reputation.

The court initially will consider whether Vazirani's responses to Heitz and Canfield's averments create issues for trial. The relevance of the termination of the "Metro" contract is unexplained. Callahan and Canfield are not fraternity brothers. Callahan and Foster are fraternity brothers but the relevance of Foster's compliment about Canfield, who is <u>not</u> Foster's fraternity brother, is a mystery. The "falsity" of the Clendenin letter is unsupported by facts. Vazirani has never challenged the facts pertaining to Aviva's change of strategy. His point, apparently, is that he was a good producer who, as he puts it, should not have been terminated. But the undisputed facts are that Aviva also terminated other good producers for the same reasons. In other words, Vazirani was not singled out. Vazirani disingenuously states that Jacquinot "did not recommend" termination. Canfield did leave Aviva to start Innovation Design which had offices in Advisors Excel's building. So what? None of Vazirani's responses refute Heitz and Canfield's reasons for the termination. They provide no facts <u>at</u> <u>all</u> that Heitz and Canfield benefitted financially or had any personal interest in the termination

-17-

or that either man had any financial interest in Advisors Excel or Annexus.

Finally, Vazirani's denials of defendants' facts 26 and 35 do not create genuine issues of material fact. Rather, they are admissions with a twist favorable to Vazirani. Vazirani's responses to defendants facts 102 and 103 are conclusory and devoid of factual support.

## Applicable Law

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim. Adamson v. Multi Community Diversified Svcs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008). When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). If so, the court cannot grant summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## Discussion

-18-

The parties agree that all substantive issues are governed by Arizona law.

Tortious Interference

By Memorandum and Order dated March 15, 2011 (Doc. 62), the court denied Heitz and Canfield's motion dismiss Vazirani's tortious interference, conspiracy and aiding and abetting claims. In considering Vazirani's tortious interference claims[4] the court observed:

> Under Arizona law, an officer of a corporation cannot interfere with the corporation's contracts. <u>Southern Union Co. v. Southwest Gas Corp.</u>, 165 F. Supp.2d 1010, 1038 (D. Ariz. 2001). Plaintiffs may proceed with their claims against defendants, however, if they establish defendants actions' were so contrary to Aviva's interests that they could only have been motivated by personal interests. <u>Id.</u>

> Plaintiffs alleged several facts regarding their performance while under contract with Aviva. Plaintiffs sold millions of dollars in policies for Aviva and allegedly never received a complaint from a customer. While defendants assert that plaintiffs were no longer a part of Aviva's business model, the court must look at the facts alleged in the amended complaint in a light most favorable to plaintiffs. The court finds, at this stage in the pleadings, that defendants' actions were contrary to Aviva's interests. Moreover, plaintiffs have alleged sufficient personal interests for defendants' actions. Plaintiffs allege that Canfield benefitted financially because he left Aviva's employment shortly after the termination of the contract and began employment with Advisors Excel.[5] Plaintiffs further assert that Heinz benefitted from the termination of the contract because he

---

[4]The court recognized that plaintiffs had asserted claims of both interference with a contract and interference with a business expectancy. Under Arizona law, the elements of these claims are virtually identical. <u>See</u> <u>Southern Union Co. v. Southwest Gas Corp.</u>, 180 F. Supp.2d 1021, 1047 n. 41 (D. Ariz. 2002). Therefore, as was done in the order on the motion to dismiss, the analysis for both claims will be combined in this subsection.

[5]This information was taken from the complaint. It turns out to be inaccurate. Canfield left Aviva to become CEO of Innovation Design.

wanted to pass business to his fraternity brothers. These allegations are sufficient to find that defendants' action were motived solely by personal reasons. See Chanay v. Chittenden, 115 Ariz. 32, 563 P.2d 287 (1977)(reversing the decision to grant summary judgment on a tortious interference claim in which the plaintiff, an insurance agent, was fired after another agent caused the termination and gained all of the plaintiff's business).

Arizona law also requires that the interference must be intentional and improper. Mann v. GTCR Golder Rauner, LLC., 483 F. Supp.2d 864, 871 (D. Ariz. 2007). "The tort is intentional in the sense that defendant must have intended to interfere with the plaintiffs' contract or have known that this result was substantially certain to be produced by its conduct." Id. at 872. Plaintiffs have sufficiently plead intentional and improper actions. The allegations are that defendants acted with the intent of causing plaintiffs' contract to be terminated by Aviva. Plaintiffs have also alleged improper conduct by defendants, including their attempt to set up plaintiff by recording conversations, intentionally straining relationships with Aviva and their alleged racial animus towards Vazirani. After viewing the facts in a light most favorable to plaintiffs, the court finds that plaintiffs have alleged sufficient facts to support a finding that defendants interfered with their contract and business expectancy.

Finally, defendants assert that these claims must fail because plaintiffs have failed to establish that they had a future interest in the at-will contract with Aviva. The Supreme Court of Arizona has held that a plaintiff may state a cause of action for tortious interference even if the contract is an at-will contract. Chanay, 563P.2d at 292 ("until it's terminated, the contract is a subsisting relation, of value to the parties and presumably to continue in effect.")

(Doc. 62 at 5-7).

Despite this clear statement of what Arizona law requires in order to prove intentional interference, Vazirani cites no facts, much less disputed facts, which would defeat summary judgment.

Vazirani's first "fact" demonstrating intentional interference relates to the Clendenin letter of March 20, 2009. Vazirani asserts that the reasons given for termination are false. As he puts it, "Aviva lied." But whether or not Aviva lied is not relevant (assuming

Aviva can lie). Neither Heitz or Canfield is mentioned in the letter. There are no facts in the record that Heitz or Canfield communicated with Clendenin about the letter or, for that matter, that they were even aware of the letter. Vazirani proceeds to assert that <u>Aviva</u> had "no cause" for terminating his contractual relationship and extols his successes as evidence that the true but unstated reason for his termination was the Washburn/Sigma Phi Epsilon "connection." Vazirani ignores the fact that his contract did not require "cause" for termination. The undisputed evidence is that Vazirani's conduct gave Aviva "cause" to terminate the contract. The fact that Aviva chose not to go that route, but instead exercised its prerogative under the terms of the contract, hardly makes the reasons given in the Clendenin letter a "lie."

Vazirani's second "fact" demonstrating intentional interference is what he describes as a "quid pro quo": Canfield's decision in August of 2009 to form Innovation Design with the three members of Advisors Excel. Heitz is not mentioned. Vazirani asserts that a "reasonable juror" could find that the founding of Innovation Design, along with the fact that it had office space at Advisors Excel, was a quid pro quo for Canfield's "protection of Advisors Excel" during his term at Aviva and for his termination of "Vazirani's contract." This assertion is completely lacking in factual support.[6] There is no evidence from which a "reasonable juror" could find any connection between Canfield's decisions in the fall of 2008 concerning Vazirani and his decision, many months later, to join Innovation Design.

---

[6]The fact supposedly supporting this claim is the "I like the way Jordo rolls" email, <u>supra</u>, which does not mention Vazirani.

Indeed, there is no <u>evidence</u> that Canfield had any involvement with or concerning Vazirani after November 2008.

Vazirani's third "fact" demonstrating intentional interference is so lacking in support and common sense that it hardly deserves mention: "Defendants' university and fraternity ties override Aviva's best interests in retaining Vazirani, one of their top minority advisors." Minority advisors? Where did that come from? Defendants'? There is no evidence that Canfield is a fraternity brother of anyone in this case, much less of Heitz. There is no evidence that Canfield attended Washburn. Vazirani's obsession with the Washburn/Sigma Phi Epsilon "connection" is probative of nothing, much less that Canfield intentionally interfered with his contract with Aviva.

In short, even though this court gave Vazirani the requisite benefit of the doubt in denying defendants' motion to dismiss, plus a list of the factors which Arizona law requires to prove his claims, Vazirani has offered only the same allegations and conclusory statements unsupported by relevant and material facts. He has not disputed Aviva's decision to change its business model with respect to annuity sales. He has not shown that the change was made to secure the termination of only _his_ contract, nor has he challenged the facts that the change affected many other similarly-situated independent contractors. He has not shown that Canfield benefitted financially from leaving Aviva to start Innovation Design, nor has he brought out any facts that Heitz's involvement in the termination of his contract (assuming Heitz had any), was motivated by his desire to benefit Callahan and Foster or, to put it another way, that Callahan and

-22-

Foster benefitted from Heitz's actions.  In other words, Vazirani has come forth with no evidence that Heitz and Canfield's actions were motivated solely by personal reasons, nor has he shown that their actions were improperly intended to interfere with his contract with Aviva.

Defendants' motion for summary judgment on Vazirani's tortious interference claims is sustained.[7]

Conspiracy and Aiding and Abetting

Vazirani's position is that because his tortious interference claims will survive summary judgment, his conspiracy and aiding and abetting claims likewise will survive (Doc. 132 at 26).  Vazirani is wrong but his methodology is correct.  Because his tortious interference claims do not survive, the same fate applies to conspiracy and aiding and abetting.

Conclusion

Defendants' motion for summary judgment (Doc. 121) is granted.  The clerk is directed to enter judgment in favor of defendants pursuant to Fed. R. Civ. P. 58.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged.  Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be

---

[7]Defendants' motion for summary judgment on SFS' claim of tortious interference is also sustained.  First, SFS did not have a contract with Aviva.  Second, with respect to any claim of interference of business expectancy, plaintiffs have failed to establish that defendants acted outside the scope of their employment in the termination of that expectancy.

filed.

      IT IS SO ORDERED.

      Dated this   27th   day of June 2012, at Wichita, Kansas.


                              s/ Monti Belot
                              Monti L. Belot
                              UNITED STATES DISTRICT JUDGE